IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

THOMAS J. TADDER,

                  Plaintiff,

      v.

THE BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,
MICHAEL J. FALBO and AARON BOWER,

                Defendants.

OPINION & ORDER

13-cv-105-wmc

Plaintiff Thomas J. Tadder worked for the University of Wisconsin system beginning in 1983 until his termination on April 10, 2008. In this lawsuit, Tadder now alleges that his termination was the product of employment discrimination based on disabilities, including diabetes and cognitive disabilities, as well as that his employer failed to provide him with reasonable accommodations. Following this court's initial ruling on defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), Tadder was left with two claims: (1) a claim under the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, against the Board of Regents of the University of Wisconsin System ("Board of Regents"); and (2) a claim for prospective relief under Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, against Michael J. Falbo in his official capacity as the President of the Board of Regents and Aaron Bower in his official capacity as Chancellor of the UW Colleges.[1]

---

[1] Falbo was substituted as a party defendant for the previous President of the Board of Regents of the University of Wisconsin System, Brent Smith. (Dkt. #17.) Aaron Bower, the current Interim Chancellor for the University of Wisconsin Colleges and University of Wisconsin Extension, has been substituted for the previous Chancellor, Ray Cross.

Currently before the court is defendants' motion for summary judgment (dkt. #22), which challenges Tadder's remaining claims on multiple grounds, including that: (1) defendant Falbo lacks the authority to grant the injunctive relief Tadder requests; (2) Tadder was not disabled; (3) defendants lacked knowledge of his disability, even if disabled; and (4) no reasonable jury could find in Tadder's favor on his failure-to-accommodate and discrimination claims. The court finds no reasonable jury could conclude that defendants failed to provide him with reasonable accommodations, nor that his disabilities were the cause of his termination. Accordingly, defendants' motion for summary judgment will be granted.

UNDISPUTED FACTS[2]

**I. Background**

Plaintiff Thomas Tadder's personnel file has been maintained at the University of Wisconsin Colleges Central Office, located in Madison, Wisconsin, since June 2008; it is currently under the control of Pamela Dollard, the Director of Human Resources for the University of Wisconsin Colleges. The file includes a document dated August 13, 1982, from the Wisconsin Division of Vocational Rehabilitation (the "DVR Document"), indicating that Tadder "has a disability which results in a substantial vocational/occupational handicap based upon available documentation." (*See* Dollard Aff. Ex. 101 (dkt. #26-1).) The document does not indicate what his disability is, how much it interferes with his ability to perform any specific functions or what accommodations would be appropriate.

---

[2] The court deems the following facts material and undisputed unless otherwise noted.

There is also no evidence that the DVR Document was ever forwarded to UW-Rock County or to any employee thereof while Tadder worked there, nor is there evidence that the presence of the DVR Document in Tadder's file was disclosed to anyone on staff at UW-Rock County. On the contrary, the DVR Document does not appear in any personnel file maintained on the UW-Rock County campus. Neither Tadder's personnel file nor a separate file in which employees' disability-related accommodation requests are stored contain any documents in which Tadder identified himself as having a disability or requested accommodation.

Tadder was also diagnosed with diabetes in 1990 and began insulin treatments in 1993. Several of Tadder's coworkers were aware that he had diabetes. Moreover, he occasionally took medication for it while on the job. University administration became aware of his diabetes as early as 2002.

## II. Tadder's Generally Satisfactory Job Performance

Tadder was hired as a Building Maintenance Helper II at the University of Wisconsin-Madison on or around March 8, 1983. He passed his probationary period there on September 7, 1983, with either "good" or "average" scores in each rating category. Tadder was also evaluated as "satisfactory" in 1985, '86 and '87, with his supervisor, Donald Philipp, noting in 1986 that he was "a very hard working employee." (Bach Decl. Ex. 201 (dkt. #35-2) 2-3.) He worked at UW-Madison until January 4, 1988, when he got a job as a second shift Building Maintenance Helper II (later changed to Custodian II) at University of Wisconsin-Rock County. In that capacity, Tadder performed duties including vacuuming, mopping floors and removing trash. His position's description also included

duties like cutting grass, trimming bushes and trees, using a snowblower and snowplow, and making minor repairs to equipment. Tadder passed his probationary period at UW-Rock County on July 3, 1988.

Tadder's first performance review at UW-Rock County stated that he was devoted to his position, was eager to do the best job he could, and that he had to "work harder than most to achieve his goals," also stating that he was a "very friendly person" and cared about what others thought of him. His next performance evaluation, for July 1, 1988, through June 30, 1989, was also generally favorable. That evaluation stated that he knew "that every day is a day to learn and a continual challenge" and that he had progressed in his job responsibilities and his personal life.

For the next period, July 1, 1990 through June 30, 1991, Tadder's evaluation stated that he "ha[d] the knowledge and skills to perform his position responsibilities and ha[d] shown he can accomplish all assigned tasks." The following year's evaluation was also generally favorable, indicating that he had improved in remaining composed and found advance planning and improved skills enabled him to better handle changes on short notice. It called him "an equal partner in the crew as well as an important member of the campus staff." The evaluation went on to note that: "By discussing his problems, the reasons and the circumstances are more understandable thus can be more readily accepted."

At some point following the 1991-1992 evaluation, Michael Connor, the Superintendent of Buildings and Grounds, became Tadder's new supervisor.[3] Connor completed his June 1993-June 1994 performance evaluation. That evaluation listed several

---

[3] Connor had limited ability to supervise the custodial staff directly, because he worked first shift, and the custodians worked other shifts. Thus, Tadder had other direct supervisors throughout his employment as well.

new goals, including becoming more familiar with power equipment, working "smarter," broadening knowledge of minor electrical repairs and machine maintenance, becoming more self-sufficient and avoiding reliance on coworkers. In 1994, Tadder submitted two requests for leave without pay, citing medical reasons. Tadder's 1995 evaluation, also signed by Connor, indicated that Tadder had been assigned to a new building, which caused him stress, and that he had not been trained to operate a snowblower, cut grass or make minor repairs beyond changing light bulbs.

In a memo to Tadder dated August 18, 1995, Connor informed him that he had failed to lock doors for the second time that week and threatened disciplinary action. His next performance evaluation, running from June 1995 to June 1996, stated that he needed to learn to deal with difficult persons and learn additional areas of the campus. It also repeated the statement that Tadder had not been trained to plow snow or cut grass, but that he could change light bulbs. Finally, it noted that he was often upset by small changes in his routine.

In a memo to Tadder dated October 10, 1996, Connor stated that Tadder had taken too long on his breaks at least six times during that year, and threatened to write a letter of reprimand. This memo and the memo from 1995 were the earliest reprimands found in Tadder's personnel file.

Tadder's performance evaluation for July 1, 1997, through June 30, 1998, again completed by Connor, stated that Tadder still had not been trained to plow snow or cut grass, but that he changed light bulbs, moved furniture, shoveled snow and emptied trash. The evaluation also stated that the custodial crew as a whole did "an acceptable job," although the crew was often "not as productive as it need[ed] to be." It stated that future

building projects and a higher standard for building and ground care required working smarter and more productively.

In Tadder's February 11, 2000, performance evaluation, Connor again related that the custodial crew was not as productive as it needed to be and that there was a higher standard for building and grounds care, mandating greater productivity and smarter job performance. Connor also emphasized that Tadder needed to be more self-sufficient and aware of details and that he needed to think about work more.

Dorothy Kremm, Custodial Supervisor and Tadder's direct supervisor at the time, completed Tadder's next performance evaluation around August of 2000. In that evaluation, she noted Tadder's good effort and willingness to "try new methods with encouragement." On June 26, 2002, in contrast, Connor gave Tadder a written reprimand for failing to lock doors at the end of his shift.

### III. Disciplinary Incidents in Early 2004

On or about February 2, 2004, Connor drafted an e-mail apparently memorializing a meeting between Tadder, Kremm and Connor regarding how Tadder's diabetes affected his work. The e-mail referred to the need for Tadder "to be responsible for his health and how it relates to his work and operation of equipment." (*See* Bach Decl. Ex. 220 (dkt. #35-21).) The e-mail also stated that Tadder needed to be told how to operate all the equipment in his area, which was "unacceptable." (*Id.*) Tadder's next performance evaluation, dated February 27, 2004, echoed these concerns. For example, during the evaluation, Kremm observed that Tadder "seems to intentionally forget how to operate everything as instructed

after about a week of not operating the piece." Kremm also noted that Tadder was learning how to send e-mails, but that his learning was "a very slow process."

On February 12, 2004, Connor notified Tadder via letter that there was to be an investigatory meeting regarding the length of the break he had taken on February 5. Diane Lund, the Human Resources Manager for the University of Wisconsin Colleges, drafted that letter.[4] Connor also asked Lund via e-mail whether it was her task to write the disciplinary outcome of the meeting as well. (*See* Bach Decl. Ex. 222 (dkt. #35-23).) She responded that she would prefer to work with Connor on such matters. On February 19, 2004, Connor sent Lund an e-mail with an attachment detailing a litany of alleged problematic incidents involving Tadder going back to 2000. (*See id.* at Ex. 223 (dkt. #35-24).) Only one of the many entries dealt with the length of his break on February 5. That same day, Connor sent Tadder a written reprimand for taking too long a break on February 5. (*See id.* at Ex. 224 (dkt. #35-25).)

## IV. Communication between Tadder's Physician and Human Resources

On March 16, 2004, Tadder's physician, Dr. Robert Penn, sent a letter to Tadder's supervisor at the time, Dorothy Kremm, stating that Tadder had insulin-dependent diabetes, obesity, chronic mild fatigue and recent depressive disorder. Penn further explained that Tadder had been instructed to reduce his evening dose of insulin before going to work, and that accommodations would be "helpful" if Tadder had a hypoglycemic reaction, such as giving Tadder a 15- to 20-minute break to have a sugary snack. Penn said

---

[4] Lund's job duties included recruitment and staffing of classified positions, classification of positions, participation in employee relations and labor management issues, management of leave and accommodation issues, administration of UW Colleges policies and procedures, administration of professional development, and management of compensation.

that it would be "helpful" if Tadder's coworkers would assist in that regard, specifically explaining that any memory issues Tadder was having could be "in part related to the depression and partly related to his diabetic control." (Lund Aff. Ex. 103 (dkt. #28-1) 2.) Finally, Penn wrote that "frequent reminders" would be helpful to Tadder if he forgot to perform a task. (*Id.*)

Kremm shared Penn's letter with Lund. In response, Lund sent a letter dated March 23, 2004, in which she asked Tadder to fill out a Disability Accommodation Request Form and work with Penn to: (1) "[p]rovide very specific information with regard to recommended accommodations"; and (2) determine whether, in Penn's medical opinion, Tadder could perform the essential functions of his position with the specific accommodations. (Lund Aff. Ex. 104 (dkt. #28-2) 1.)

On April 27, 2004, having received no response to her earlier inquiry, Lund sent Tadder another letter, enclosing a copy of the previous letter and indicating that without additional information from Penn, Lund was "unable to make a decision as to whether [Penn's recommended] accommodations are reasonable and whether, if those accommodations are approved, you will be able to perform the essential functions of your position." (Lund Aff. Ex. 105 (dkt. #28-3) 1.)

Tadder continued to receive reprimands during 2004. For example, on April 1, 2004, Tadder received a written reprimand from Connor for violating three work rules; the reprimand stemmed from Tadder taking his work keys home for the night and having to retrieve them from home the next day. On June 4, 2004, Connor sent Tadder a letter suspending him for one day for failing to wear protective gloves while cleaning a bathroom. By August 16, 2004, Lund e-mailed Pierick and Connor explaining that she was looking for

a physician to perform an independent medical exam on Tadder as part of "the route we need to take to bring this to some sort of closure (i.e., medical termination)." (Bach Decl. Ex. 229 (dkt. #35-30) 1.) Pierick responded: "I agree it is at a crisis level. It is very sad, but we are not doing Tom any favors by carrying him either. He needs a wake[-]up call or some time he is not going to wake up." (*Id.*) On August 30, 2004, Pierick sent an e-mail to Steve Wildeck asking whether funds were available for the "extraordinary expense" of the independent medical exam.

Tadder never received such an exam, nor was he examined by a doctor to determine what effect his cognitive issues had on his work performance. Even so, thoughts about Tadder's medical termination continued. On September 2, 2004, Lund wrote directly to Penn. She included a medical release form Tadder had signed and requested answers to several questions, including: (1) whether Tadder's diabetes affected his ability to perform his job duties and, if so, how; (2) what accommodations would enable him to perform his job in a safe and effective manner; (3) what impact his diabetes had on Tadder's behavior; (4) whether Tadder had other physical or mental conditions; (5) whether accommodations could be made for those; and (6) whether Penn recommended further evaluation and treatment by other medical or mental health professionals. (Lund Aff. Ex. 106 (dkt. #28-4) 3-4.)

On October 18, 2004, Penn responded. He indicated that Tadder had insulin-dependent type 2 diabetes, peripheral neuropathy, obesity, chronic diarrhea and depressive disorder, and explained again that Tadder's ability to perform his job duties would be affected by the diabetes "to some extent." Penn wrote that with good control of his diabetes, Tadder still would likely have a hypoglycemic reaction one to three times per

month.  At times, Penn also reported that Tadder's legs would bother him, such that he would be unable to stand or walk for extended periods or could be more prone to falling.

Penn also indicated concern that Tadder was not managing his diabetes successfully. He recommended that Tadder keep sugary snacks available.  In response to Lund's inquiry about accommodations, Penn wrote:

> In terms of accommodations which might enable Mr. Tadder to perform his job safely, I believe that if his coworkers were willing and able to help out during episodes of hypoglycemia that would be super but nonetheless, the burden on the coworkers may be too great for them to pursue that.  Obviously, if he had a best friend at the workplace who would take a special interest in Tom, that might be of more advantage, but I am not sure that is the case in this circumstance.

(Lund Aff. Ex. 107 (dkt. #28-5) 2.)  Finally, he wrote that it would be a good idea to have Tadder evaluated by neuropsychologist Howard Gartland, "who deals with complex issues pertaining to the interplay between mental and physical disorders."  (*Id.* at 3.)

On November 18, 2004, Lund sent Tadder a follow-up letter enclosing a Family Medical Leave Act ("FMLA") Employee Request form that Tadder had previously filled out. Lund informed Tadder that he had not fully completed the request and so she was not exactly sure what he was requesting, but that if he completed the request, "[c]ertainly your diabetes would qualify as a 'serious health condition' under the law."  (Lund Aff. Ex. 109 (dkt. #28-7).)  Lund renewed her request again on February 8, 2005, stating that after Tadder clarified what he was requesting, the request would be approved under FMLA and the Wisconsin FMLA.  (Lund Aff. Ex. 110 (dkt. #28-8).)  Apparently, Tadder responded to this second letter, and on March 1, 2005, Lund approved Tadder's request to take sporadic leave for his diabetes.  (Lund Aff. Ex. 113 (dkt. #28-11).)

Seven days later, by letter dated October 25, 2004, Lund informed a union representative that she was considering a medical termination for Tadder. Lund and Connor had another internal e-mail exchange on November 4 and 5, 2004. (*See* Bach Decl. Ex. 232 (dkt. #35-33).) In that e-mail exchange, Connor said that he wanted to suspend Tadder for lying about unfinished work and proposed a three-day suspension. Lund's response read, in relevant part, as follows:

> After sleeping on this, I'm beginning to reconsider whether a 3-day suspension is appropriate or whether that reinforces what Tom is already feeling (that he's being persecuted, picked on, and harassed). I'm afraid we're (me included) looking at Tom's progressive discipline as the means to terminate him, rather than a way to improve behavior, which is what it's really supposed to be. Granted, he did lie about the work he had completed and I feel he should be disciplined, but I'm now thinking that a 3-day suspension is perhaps too harsh and a 1-day suspension would be more appropriate.

(*Id.*) On November 9, 2004, Lund sent Connor a draft of a letter suspending Tadder for one day, instead of three.

## V. Disciplinary Incidents between 2006 and 2008

By 2006, Tadder was apparently having problems completing his job duties satisfactorily. On April 20, 2006, an investigatory meeting was held. On April 25, 2006, Tadder's direct supervisor at the time, Gary Gritzmaker, sent an e-mail to Lund in which he attributed "Tom's not being dependable" being due "mainly to a combination of forgetfulness and not taking what he has been told serious[ly]." (Connor Aff. Ex. 116 (dkt. #29-3).) Gritzmaker recommended that disciplinary actions continue "in an effort to try and get [Tadder] to improve to a point where he is dependable and doing his share of work." (*Id.*) Gritzmaker ended the e-mail by stating: "I have let Tom get by with things

that I would not let the other custodians get by with, in hopes that he would improve and because he was showing improvement." (*Id.*)

The next day, at a pre-disciplinary hearing, Tadder admitted that he had not performed unspecified "assigned tasks," and provided no valid justification for his not being disciplined. Accordingly, Tadder was issued a written reprimand for insubordination, including disobedience or failure or refusal to carry out assignments or instructions; and negligence in the performance of his assigned duties. (*See* Conor Aff. Ex. 117 (dkt. #29-4).)

Less than three weeks later, on May 9, 2006, Tadder allowed a bottle of cleaning fluid that had been two-thirds full and was worth approximately $50 to drain into a closet. Connor attended an investigatory meeting on May 15, 2006, where Tadder admitted the infraction. On May 16, 2006, Tadder was issued a written reprimand for negligence in the performance of his assigned duties.

On October 26, 2006, Tadder failed to return to work at 9:30 P.M., after taking his second scheduled break. During an investigatory meeting on December 4, 2006, Tadder admitted this infraction as well, explaining that he had not tested his blood sugar as he had indicated he would and failed to contact a supervisor. On December 19, 2006, Lund sent Tadder a disability accommodation form, which he did not fill out.

On January 10, 2007, Tadder was issued a written reprimand for loafing, loitering, sleeping or engaging in unauthorized personal business, as well as negligence in the performance of his assigned duties. On January 17, 2007, he served a one-day suspension without pay for these infractions.

## VI. Tadder's Termination

Beginning in early October of 2007, a series of additional incidents culminated in Tadder's termination. On October 12, 2007, Tadder failed to lock doors during his evening shift and left work later than his time records reflected. On October 15, 2007, Tadder removed several books from the floor of an English professor's office and disposed of them in the trash.

On October 18, 2007, Connor sent Tadder two letters setting up an investigatory meeting for the violations. That investigatory meeting was held on November 5, 2007, at which Tadder admitted having left the doors unlocked and falsifying his timesheet. He also acknowledged seeing an e-mail saying that nothing should be removed from a workspace as trash or recycling unless it was labeled as such.

After that meeting, Connor inquired whether the next meeting would be disciplinary or pre-disciplinary. Lund explained that Tadder needed to be afforded an opportunity to explain why he should not be disciplined before discipline could be imposed. (*See* Bach Decl. Ex. 235 (dkt. #35-36).) At the next, pre-disciplinary meeting held on November 28, 2007, Tadder admitted throwing out the books, recognized that he was wrong to have done so and did not attempt to excuse his behavior. (*See* Connor Aff. Ex. 120 (dkt. #29-7) 1.) For these infractions, Tadder was issued a five-day suspension. (*Id.*)

Sometime between 3:00 P.M. and 3:45 P.M. on February 7, 2008, Tadder slipped and fell while emptying the outside garbage, apparently injuring his ankle. Connor was at work until 5:00 P.M. that day and informed the custodians when he left. Tadder did not, however, report his injury, in violation of University protocol. His time card indicated that he was the last to leave the campus at 11:32 P.M. that night. On February 8, 2008,

Tadder's wife called to inform the University that he would be taking the day off to have his ankle treated.

Sometime after February 7, 2008, Connor spoke with Lund about Tadder's poor work performance and recommended that he be terminated. No later than February 19, 2008, while Tadder was still seeing doctors for his work-related injury, Connor and Lund began to set up an investigatory meeting for possible disciplinary action. On February 26, 2008, during that investigatory meeting, which Connor attended, Tadder admitted that:

- He left the outside door to the maintenance shop unlocked on February 7, 2008 and on other occasions.

- He stored bags of trash in his closet, although he knew it violated written policy and had received previous verbal warnings not to store trash in his closet.

- He left paper towels on the floor and was aware of the policy requiring him to keep paper towels on the shelf.

(Connor Aff. Ex. 122 (dkt. #29-9) 1.)

At the pre-disciplinary meeting that followed on March 26, 2008, Tadder provided no reason why he should not be disciplined. On April 10, 2008, Tadder was terminated from his employment at UW-Rock County. The letter listed as reasons for termination actions including "leaving the maintenance shop unlocked overnight, storing garbage in [his] cleaning supply closet, and being responsible for the damage of cleaning supplies." (*See* Bach Decl. Ex. 239 (dkt. #35-40).) It also stated that Tadder had already been issued a written reprimand and 1-, 3- and 5-day suspensions, such that termination was "in accordance with accepted progressive discipline procedures." (*Id.* at 2.) Tadder did not file a formal complaint or grievance at any time while he was employed at the University.

## VII.  Vocational Evaluation of Tadder

In 2013, Kevin Schutz, a vocational rehabilitation counselor, analyzed Tadder by administering portions of the General Aptitude Battery test.  He found that Tadder scored in the 32nd percentile in reading comprehension, the 9th percentile in sentence comprehension, the 39th percentile in spelling and the 10th percentile in math computation.  Schutz's evaluation concludes that "Mr. Tadder is an individual with significant disability related concerns and issues" with "a history of cognitive difficulties." (Bach Decl. Ex. 240 (dkt. #35-41) 12.)  In a subsequent supplemental evaluation, Schutz stated that Tadder is "an individual with limited ability to problem solve at a level sufficient to identify even routine or relatively simple accommodations."  (Bach Decl. Ex. 241 (dkt. #35-42) 2.)

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the initial burden is met, for an issue on which the nonmoving party will bear the

burden of proof at trial, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Id.* at 323.

## I. ADA Claim against Defendant Falbo in his Official Capacity

Defendants first assert that defendant Michael J. Falbo must be dismissed from this lawsuit because he does not have the authority to grant Tadder the relief he seeks. Tadder's only claim against Falbo in his official capacity is for prospective injunctive relief, in the form of reinstatement and an order to cease its discriminatory practices against Tadder. The parties appear to agree that the Board of Regents has the authority to reinstate Tadder. (*See* Defs.' Reply (dkt. #43) 2.) Defendants nevertheless argue that Falbo, who is President of the Board of Regents, does not have that power distinct from the Board as a whole.

While "a claim for injunctive relief can stand only against someone who has the authority to grant it," *Williams v. Doyle*, 494 F. Supp. 2d 1019, 1024 (W.D. Wis. 2007), it is less obvious that Falbo *alone* must have that authority. "Official-capacity suits . . . are deemed to be against the entity of which an officer is an agent." *Kroll v. Bd. of Trustees of Univ. of Ill.*, 934 F.2d 904, 907 (7th Cir. 1991) (internal quotation marks omitted); *see also McMurry v. Sheahan*, 927 F. Supp. 1082, 1088 (N.D. Ill. 1996) ("A suit against a government officer in his official capacity is actually a suit against the government entity for

which the officer works.") (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). Accordingly, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Graham*, 473 U.S. at 166.

Thus, this case should be treated like a suit against the Board of Regents itself in all respects other than name. Given that defendants acquiesce in Tadder's position that the Board as a whole may reinstate him, the court will not grant defendants' motion for summary judgment on this basis.

## II. ADA Claim against Defendant Bower in his Official Capacity

Initially, defendants argued that there was no evidence defendant Aaron Bower was involved in Tadder's termination and that he does not meet the *Ex parte Young* exception to Eleventh Amendment immunity. In response, Tadder cites Wis. Stat. § 36.09(3)(a), which establishes chancellors as the "executive heads" of their institutions and responsible for their operation and administration. On this basis, defendants now concede that Bower has "some connection" to the enforcement of the ADA, so their motion for summary judgment as to Tadder's claim against Bower will also be denied.

## III. Genuine Dispute of Material Fact

Finally, defendants seek summary judgment on *all* of Tadder's claims because he failed to establish a genuine issue of material fact with regard to various elements of those claims. Title I of the ADA prohibits certain employers, including the states, from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to . . . the hiring, advancement, or discharge of employees[.]" 42 U.S.C. § 12112(a). The Rehabilitation Act provides that "[n]o otherwise qualified

individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a). With the exception of the "solely by reason of" standard of causation, the Rehabilitation Act incorporates the standards of the ADA's Title I. *Brumfield v. City of Chicago*, 735 F.3d 619, 630 (7th Cir. 2013).

Tadder's claims essentially fall into two categories: (1) he was terminated because of his disability; and (2) defendants failed to provide him with reasonable accommodations, which is an independent basis for liability under both the ADA and the Rehabilitation Act. *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 751 (7th Cir. 2006); *see also Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012) (relief for failure to accommodate under ADA and Rehabilitation Act is coextensive). As previously noted, because Tadder was terminated before the January 1, 2009, effective date of the ADA Act of 2008 ("ADAA"), all of his claims are governed by pre-amendment law. (*See* Opinion & Order (dkt. #13) 6 n.2.)

### A. Whether Tadder is Disabled

Defendants first argue that Tadder does not have a disability, which is required for both his discrimination and his failure to accommodate claims. *See Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001) ("As a threshold requirement, Hoffman must first establish that she has a disability as defined by the ADA."). The ADA defines "disability" as follows:

The term "disability" means, with respect to an individual—

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment[.]

42 U.S.C. § 12102(1). Determining whether a person has a "disability" pursuant to this definition requires the court to consider: (1) whether the claimed disability was an impairment; (2) whether the claimed life activity constitutes a "major life activity"; and finally, (3) whether the impairment substantially limited that life activity. *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).

As originally enacted, the ADA did not define the meaning of the term "major life activity." Tadder identifies three different "major life activities" he contends his impairments substantially limited him in carrying out: eating, caring for himself and working. According to current Equal Employment Opportunity Commission regulations implementing the ADA, all three of those constitute major life activities. *See* 29 C.F.R. § 1630.2(i) (2013).[5] Pre-ADAAA case law supports Tadder's identification of these activities as well. *See, e.g., Squibb v. Memorial Medical Ctr.*, 497 F.3d 775, 784 (7th Cir. 2007) (caring for oneself is a major life activity); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 923 (7th Cir. 2001) (eating); *Sinkler v. Midwest Property Mgmt. Ltd. P'ship*, 209 F.3d 678, 684 (7th Cir. 2000) (working).

---

[5] Since the early 1990s, federal courts have identified additional major life activities, such as sitting, standing, bending, communicating, lifting, reaching, sleeping, eating, reading and mental/emotional processes such as thinking, concentrating and interacting with others. All of the major life activities mentioned above are now specifically included in the ADA definition of major life activities due to the ADAAA. *See* 42 U.S.C. § 12102(2)(A). Congress also broadened the definition of major life activities to include the operation of major bodily functions such as the "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine and reproductive functions." *Id.* at § 12102(2)(B).

To be "substantially limited" in performing such an activity, a person must either be: (1) unable to perform a major life function, or (2) significantly restricted in the duration, manner or condition under which he or she can perform a particular "major life activity," as compared to the average person in the general population. *Peters v. City of Mauston*, 311 F.3d 835, 843 (7th Cir. 2002). Of relevance to this determination are "the nature and severity of the limitations, the actual or expected duration of the impairment, and the actual or anticipated long-term impact of the impairment." *Lawson*, 245 F.3d at 926. An impairment need not cause an utter inability to perform the activity in question to constitute a substantial limitation on that activity, however. *Branham v. Snow*, 392 F.3d 896, 902 (7th Cir. 2004). Whether a plaintiff has an impairment and whether it substantially limits a major life activity must be decided on a case by case basis. *Dadian v. Village of Wilmette*, 269 F.3d 831, 837 (7th Cir. 2001).

Tadder argues that he has produced enough evidence to survive summary judgment under all three of the statutory definitions of "disability." Under the standards of the ADAAA, the court would generally agree. Pre-ADAAA, however, the question is a much closer one for reasons explained below.

i.    **Physical or Mental Impairment that Substantially Limits One or More Major Life Activities**

Tadder first points to his various cognitive impairments as evidence of a disability. As support, he cites the 1982 DVR Verification of Vocational/Occupational Handicap, which certifies that he has "a disability which results in a substantial vocational/occupational handicap based upon available documentation." Additionally, Tadder argues, those cognitive impairments were confirmed by (1) Dr. Penn in 2004 when

he noted that Tadder "has depressive disorder with associated intermittent cognitive deficits" and those cognitive difficulties "might make it more difficult for [him] to adequately control [his] diabetes" (Lund Aff. Ex. 107, at 1); and (2) by the vocational expert, Schutz, in 2013, who analyzed Tadder and found he has below average reading comprehension and math computation, as well as low verbal aptitude and "low below average" clerical perception.[6]  (Bach Decl. Ex. 240, at 8-9.)

Medically-diagnosed mental conditions are recognized disabilities under the ADA. *Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1059 (7th Cir. 1998).  Defendants appear to take the position that because Tadder's cognitive defects were identified by vocational counselors, rather than a medical professional, they cannot constitute an impairment.  Defendants cite no case law for this argument.  Just as importantly, they ignore Dr. Penn's explicit medical diagnosis of depressive disorder with associated intermittent cognitive defects.[7]  Defendants concede that depression, at least, constitutes a mental impairment, and on the evidence in the record, a reasonable jury could certainly find that Tadder suffered from depression.

More persuasive are defendants' arguments that Tadder has not shown that his depression and cognitive impairments substantially limit any of the "major life activities" he identifies.  The court agrees that Tadder's own work history -- 25 years of employment with the University of Wisconsin system -- undermines any claim that his cognitive impairments "substantially limit employment *generally*."  *Sinkler*, 209 F.3d at 685 (emphasis added).

[6] Schutz defines clerical perception as "an ability to use visual discrimination skills and quickly identify the differences in written or tabular material."  (Bach Decl. Ex. 240, at 9.)
[7] In light of Dr. Penn's statement that Tadder "has depressive disorder with associated intermittent cognitive defects," as well as "depression and anxiety issues" (Lund. Aff. Ex. 107, at 1), the court also rejects defendants' argument that Penn made "no specific statement . . . of what those cognitive impairments actually are." (Defs.' Br. Reply (dkt. #43) 6.)

While Tadder has produced at least some evidence from which a jury could infer that he was limited in his ability to perform the particular duties of his position, "'an inability to perform a particular job for a particular employer' is not sufficient to establish a substantial limitation on the ability to work." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996) (quoting *Byrne v. Bd. of Educ., Sch. of West-Allis-West Milwaukee,* 979 F.2d 560, 565 (7th Cir. 1992)). Likewise, he has produced no evidence that his cognitive impairments limit his ability to eat.

Whether Tadder's depressive disorder and accompanying cognitive impairments *in combination with* his diabetes substantially limit his ability to care for himself is a closer question. Dr. Penn specifically states that Tadder's cognitive disabilities might make controlling his diabetes more difficult, and his letter concludes that Tadder's diabetes "has been difficult to manage, partly because of his depression and consequential <u>fair</u> compliance with the diabetic regimen." (Lund Aff. Ex. 107, at 3 (emphasis in original).) That prediction is borne out by the evidence in the record of Tadder's frequent hypoglycemic reactions. (*See, e.g.*, Lund Aff. Ex. 106 (describing several medical incidents); *id.* at Ex. 107 (noting that according to Lund's reports Tadder "has had frequent hypoglycemic reactions with altered consciousness requiring the help of his coworkers").)

The problem for plaintiff is that he is held to a higher standard. Prior to the ADAAA, the United States Supreme Court ruled that, in order to be "substantially" limiting, an impairment must "prevent or severely restrict" an individual from doing activities that are of central importance to most people's daily lives. *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 1998 (2002). Similarly, the EEOC regulations stated that an impairment would be considered substantially limiting if an individual could

not perform, or was significantly limited in the ability to perform, an activity as compared with an average person in the general population.[8]  Both bodies of law adopted the principle that intermittent impairments are not substantially limiting.

Under this more restrictive standard, Dr. Penn's actual medical opinion arguably works *against* Tadder suggesting, as it does, that Tadder's ability to care for himself is, at best, mildly compromised by his cognitive impairments, not that those impairments entirely *prevent* or even severely restrict it.  (*See* Lund Aff. Ex. 107 (noting that Tadder "sometimes . . . does not take as good [of] care of himself as he ought to," that he "seems to be a little bit sluggish" in keeping sugary snacks nearby and that his depression and cognitive impairments "might" make control more difficult).)  Likewise, Dr. Penn does not suggest that Tadder is *prevented* from working or eating, or even severely restricted in his ability to do either.  On the contrary, Dr. Penn's letters suggest that Tadder needed only minor accommodations to perform even his current job.

Tadder's arguments with respect to his diabetes alone suffer from the same problem. While there appears to be no dispute between the parties that diabetes is a physical impairment, as with Tadder's depression and cognitive impairments, the parties dispute whether Tadder's diabetes *substantially* limited him in carrying out the major life activities of working, eating or caring for himself.

Before the ADAAA, diabetic status, "per se, [was] not sufficient to qualify as a disability under the ADA."  *Nawrot v. CPC Int'l*, 277 F.3d 896, 904 (7th Cir. 2002).  Still,

---

[8] When Congress passed the ADAAA, it stated that these interpretations of "substantially limiting" expressed too high a standard for plaintiffs to prove.  It did not, however, adopt a new definition of the term "substantially limits."  Thus, even in the ADAAA era, an individual's impairment must limit one or more major life activities in a substantial manner, albeit no longer "prevent or severely restrict" a major life activity, in order for the impairment to qualify as an ADA disability.

Seventh Circuit case law indicates diabetes *could* qualify as a disability under the pre-ADAAA standard if it substantially limited the ability to think or care for oneself, *id.* at 905, or the ability to eat, *Lawson*, 245 F.3d at 924.[9]  Penn's letter to Lund dated October 18, 2004, does state that Tadder's diabetes would affect his job abilities "to some extent." (Lund Aff. Ex. 107, at 1.)  As examples, Penn indicated that Tadder had neuropathy in his legs, causing pain and numbness such that he might not be able to stand or walk for extended periods and might be prone to falling.  (*Id.*)  Penn also stated that Tadder's diabetes is "somewhat difficult to control . . . requiring both oral agents and insulin" and that, even with good control, Tadder would be expected to have one to three hypoglycemic reactions per month.  (*Id.* at 1-2.)

Defendants argue that this evidence is still not sufficient to show a *substantial* limitation of Tadder's ability to work, eat or take care of himself and seeks to distinguish similar cases finding otherwise on the grounds that those plaintiffs' diabetic conditions were far more severe than Tadder has proven his own to be.  For example, while the plaintiff in *Nawrot* had to inject insulin three times daily and test his blood sugar ten times daily, Tadder has submitted no evidence as to how frequently he must inject insulin or regularly monitor his actual blood sugar level, if at all.  *Nawrot*, 277 F.3d at 901.  Likewise, while the plaintiff in *Branham* was significantly restricted as to when and what he could eat and had to regulate his diet based on blood sugar levels, exertion, stress and illness, Tadder has

---

[9] Post-ADAAA, the endocrine system is expressly listed as a "major bodily function" and its operation as a "major life activity."  42 U.S.C. § 12102(2)(B).  This would appear to generally establish diabetes as an impairment imposing a substantial limitation on a major life activity.  *See* 29 C.F.R. § 1630.2(j)(3)(iii) (2012) ("[I]t should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . diabetes substantially limits endocrine function[.]").

presented no evidence of a similarly strict regimen of any sort. *Branham*, 392 F.3d at 903-04.

Given the relatively small amount of evidence Tadder offers about his diabetes and Dr. Penn's limited medical opinion, which focuses only on Tadder's limitations as a janitor, it is a very close question whether a reasonable trier of fact could find that his diabetes "prevented" or "severely restricted" any "major life activity" under the stricter pre-ADAAA standard. On this record, for example, Tadder has not produced enough evidence to find that his diabetes limited his ability to care for himself. Indeed, *any* impairment in caring for himself appears to stem more from his depression than his diabetes (or at best the combination of the two) and to arise out of the unsupervised, flexible nature and varied demands of his current job. As for working itself, while Tadder was first diagnosed with diabetics in 1990 and continued to work until 2008, the record might permit an inference that his diabetes worsened in the mid-2000s and, by 2006, had begun to impact his ability to do his current job, Tadder can point to nothing suggesting that his impairment was *substantial* nor that he would have been disqualified from a broad range of other jobs as a result.

The question of whether Tadder's diabetes severely restricted his ability to eat is arguably the closest question here. As the Seventh Circuit explained in *Lawson*, diabetes need not restrict "actual physical ability to ingest food" in order to substantially limit his ability to eat. 245 F.3d at 924. In *Lawson*, the plaintiff had to adjust his food intake and exertion to deal with blood sugar fluctuations. So, too, here, Tadder, an insulin-dependent diabetic, must adjust his insulin dosage to account for physical exertion at his job and be prepared to consume a sugary snack immediately upon evidence of a hypoglycemic reaction.

(*See* Lund Aff. Ex. 103.) Symptoms of noncompliance can include sweating, nervousness and upset stomach. (*See* Lund Aff. Ex. 107.) More seriously, they can also include confusion and altered consciousness. (*See* Lund Aff. Ex. 103.) Penn wrote that the frequency of Tadder's hypoglycemic reactions justified concerns for his safety, and that even with good control of his condition, one to three hypoglycemic reactions could be expected monthly. (Lund. Aff. Ex. 107.)

Even viewing this evidence in combination with his cognitive limitations *and* in the light most favorable to Tadder, however, the court has serious doubts as to this record supporting a reasonable inference that Tadder is prevented or severely restricted in the major life activity of eating. Indeed, Tadder's regimen is less demanding than the plaintiff's in *Lawson,* and there is no evidence that the effects of noncompliance rise to the level of "potentially-life threatening" as in *Lawson.* 245 F.3d at 924. On the other hand, looking at the cases the Seventh Circuit cited approvingly in *Lawson,* this case bears a greater similarity to pre-ADAAA cases finding "the potential for a 'substantial limitation' on the ability to eat" than on cases finding only "simple 'dietary restrictions' that medical conditions sometimes entail." *Id.* at 925 (comparing cases). Tadder is insulin-dependent; he is required to adjust his eating to account for exertion and stress; his hypoglycemic reactions can yield fairly serious consequences; and even with good control of his disease, he would be expected to have at least a few such reactions each month.

Ultimately, the question of whether Tadder was "disabled" under pre-ADAAA standards based on a combination of his cognitive impairments or his diabetes is extremely close. Viewing favorably the limited evidence Tadder has produced under the higher standard set by the original ADA, serious doubts still remain to whether a reasonable trier of

fact could find that Tadder was "disabled" under pre-ADAAA law. The court, however, does not need to definitively resolve this question, because, as will be discussed below, Tadder has failed to produce sufficient evidence to withstand summary judgment on other grounds.

### ii. Record of Such Impairment

Tadder also argues that he is disabled because there is a "record" of physical or mental impairment, citing to the DVR analysis, Penn's letters, his own request for medical leave and for leave without pay, and various performance evaluations and e-mails detailing his failure to take proper care of his health. At the very least, Tadder contends that these documents create a genuine dispute of fact as to whether a "record" of his impairments existed. *Cf. Lawson*, 245 F.3d at 926-27 (jury could find record based on hospital visits, evidence of medical conditions symptomatic of diabetes and receipt of disability payments).

This argument suffers from the same issues as Tadder's arguments with respect to his actual impairments, in large part because the evidence Tadder uses to support this argument is the same evidence he offers to support his theory of an actual physical or mental impairment. He points out that the effects of his diabetes are documented in the correspondence between Lund and Penn; the effects of his cognitive impairments are documented in Penn's letters and in other correspondence showing Tadder's actual problems with monitoring his diabetic symptoms adequately. (*See, e.g.*, Ex. 230.)[10] But a mere diagnosis of an impairment, without more, is not enough for § 12102(1)(B) purposes.

---

[10] A "record of impairment" claim under § 12102(1)(B) requires proof that the employer was aware of the record in question. *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 510 n.8 (7th Cir. 1998). Here, Tadder's supervisors were parties to the letters, medical leave requests and other e-mails, so there is no real dispute that they knew of those documents. The DVR analysis, however, was apparently unknown to his supervisors based on the facts of the record.

*Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 510 n.7 (7th Cir. 1998).  Moreover, as discussed above, it is doubtful whether the record is sufficient to establish that Tadder was "prevented" or even "severely restricted" in any major life activities.  Again, however, the court need not definitively resolve this question given other more glaring defects in Tadder's claims as discussed below.

### iii.    Regarded as Having Such Impairment

Finally, Tadder argues that he has a disability because he was "regarded as having such impairment" by his employer.  42 U.S.C. § 12102(1)(C).  In support, Tadder points only to performance evaluations in which his supervisors mention that he was not expected to plow snow or cut grass.  (*See, e.g.*, Bach Decl. Ex. 208, at 3; *id.*at Ex. 213, at 3.) Presumably, this evidence is intended to support a theory that Tadder is substantially impaired in his ability to work.  As defendants point out and as previously noted, however, "to be 'substantial,' a limitation on the ability to work must be one that affects the plaintiff's ability to perform a class or range of jobs before it qualifies as a disabling limitation under the ADA." *Davidson*, 133 F.3d at 511.

Here, Tadder has shown only that his supervisors may have perceived him as unable to engage in two discrete tasks, which is not sufficient to prove that they believed his impairments were serious enough to affect his ability to work *generally*.  *See Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 749 (7th Cir. 2011); *Kupstas v. City of Greenwood*, 398 F.3d 609 (7th Cir. 2005) (perceived inability to rake or shovel was not enough to show defendant regarded plaintiff as unable to work in a class or broad range of jobs).  Tadder

points to no other evidence on this point, and no reasonable jury could find that he was disabled under § 12102(1)(C) on this evidence alone.

### B. Defendants' Knowledge of Tadder's Cognitive Impairments

Defendants also argue that they lacked knowledge of any disability Tadder might have based on his cognitive impairments and, therefore, cannot be liable under the ADA. *See Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995) (holding that "an employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability"). They point out, and Tadder does not dispute, that neither Lund nor Connor read the DVR document that indicates that Tadder "has a disability which results in a substantial vocational/occupational handicap based upon available documentation."

The problem with this argument is that other documentation in the record indicates the combined impact of Tadder's diabetes and depressive disorder, such as the letters from Penn and Pierick's e-mails acknowledging Tadder's medical problems. Defendants reiterate that Tadder has produced no medical diagnosis of a "specific cognitive impairment" and that Penn does not state Tadder has a "mental handicap," but the court has already addressed those arguments.

### C. Failure to Accommodate

Defendants also argue that Tadder's failure to accommodate claim fails as a matter of law. To establish a failure to accommodate claim, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) the defendant was aware of the disability; and (3) the defendant failed to reasonably accommodate his disability. *Brumfield*, 735 F.3d at 631;

*see also Jaros*, 684 F.3d at 672 (Rehabilitation Act).[11]  An "accommodation" requires the employer to consider making changes in ordinary work rules, facilities, terms and conditions in order to enable the disabled employee to work.  *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 542 (7th Cir. 1995).  "An employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation."  *Gratzl v. Office of Chief Judges of 12th, 18th, 19th and 22nd Judicial Circuits*, 601 F.3d 674, 681-82 (7th Cir. 2010) (quoting *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 546 (7th Cir. 2008)).  The duty of reasonable accommodation is satisfied "when the employer does what is necessary to enable the disabled worker to work in reasonable comfort."  *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013).

Normally, a plaintiff must request an accommodation before liability for failure to accommodate attaches.  *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000).  There are, of course, exceptions to this general rule.  For example, there may be circumstances, such as when an employee has mental disabilities, where "the communication process becomes more difficult and the employer must meet the employee halfway."  *Id.*  Additionally, the ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation.  *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998).  Thus, the employer has at least some responsibility in determining what accommodations are necessary.  *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) (quoting 29 C.F.R. § 1630.2(*o*)(3) (1995)).  When the

---

[11] Defendants' argument premised on the second factor is that defendants only knew that Tadder had an "impairment," not a "disability," but this argument necessarily fails because the court has found a genuine dispute of fact as to whether Tadder was disabled within the meaning of the ADA.

interactive process between employer and employee breaks down, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Id.*

From the record, it does not appear that Tadder ever personally requested any accommodation. Indeed, Tadder admits he failed to fill out the Disability Accommodation Request form repeatedly provided him. Instead, Tadder relies on the letter from Dr. Penn, which suggested: (1) allowing Tadder access to snacks and breaks; (2) facilitating the assistance of coworkers during hypoglycemic reactions; and (3) having Tadder evaluated by a neuropsychologist, Dr. Gartland. (*See* Lund Aff. Ex. 107, at 2-3.)

Tadder concedes receiving the first of these suggested accommodations: he had regular breaks and access to sugary snacks. (Defs.' Reply PFOF ¶ 97.) As for the second suggestion, there is also evidence in the record that Tadder's coworkers *did* assist him during hypoglycemic reactions. (*See, e.g.*, Bach Decl. Ex. 220 (dkt. #35-21) (noting that other staff are unable to perform their own assignments "due to having to either watch over him because of medical problems or to perform his assigned duties").) And in any event, Penn himself recognized that the burden on Tadder's coworkers might be too great for such an accommodation to be reasonable. As noted above, employers need not provide their employees *every* accommodation they request, only those sufficient to enable their employees to work in reasonable comfort, and here, Tadder was granted accommodations such that he could handle his hypoglycemic reactions via sugary snacks and frequent breaks.

Finally, with respect to the third suggested accommodation, case law indicates that a neuropsychology evaluation is not an "accommodation" at all. Certainly, having Tadder evaluated by a neuropsychologist may have provided some additional insight into his cognitive impairments and would perhaps have been wise, but that evaluation in and of

itself would not have "enabled [him] to perform the essential functions of his . . . job." *Garg v. Potter*, 521 F.3d 731, 736 (7th Cir. 2008). To the extent that Tadder is suggesting defendants should have arranged to have him *treated* by a neuropsychologist, defendants are correct that the duty of reasonable accommodation "may require the employer to reconfigure the *workplace* . . ., but it does not require the employer to reconfigure the disabled *worker*." *Williams v. United Ins. Co. of Am.*, 253 F.3d 280, 283 (7th Cir. 2001) (emphasis added). Thus, defendants *did* provide Tadder with reasonable accommodations -- at least, those that Tadder's physician suggested.

Tadder also argues in his briefing that a reasonable accommodation "might have been to limit the plaintiff's duties, or have him perform the same routine tasks daily, or foster a more supportive environment as had been done prior to [Mike] Connor's arrival." (Pl.'s Resp. (dkt. #31) 15.) Tadder does not, however, point to any place in the record where he requested such an accommodation, nor where it was requested or suggested on his behalf. Even so, Tadder argues it was unreasonable for defendants to expect that he could request accommodations on his own given his cognitive disabilities.

Arguably, at least, this *was* a situation where Tadder's cognitive disabilities may have obliged defendants to meet Tadder halfway in determining a reasonable accommodation. *See Jovanovic*, 201 F.3d at 899. The problem with this argument is that defendants *did* meet Tadder halfway. They asked him on multiple occasions what accommodations he needed to perform his job. When he did not respond, the defendants sought out that same information from his doctor and made reasonable efforts to implement the suggested accommodations. The defendants even granted his FMLA request, despite Tadder's failure to respond to letters asking him what he actually needed or wanted.

Defendants cannot now be faulted for failing to provide Tadder with *additional* accommodations that neither he nor his physician ever requested. To put it another way, no reasonable jury could find that any breakdown in the interactive process of determining a reasonable accommodation was the fault of defendants. Accordingly, they are entitled to summary judgment on Tadder's failure-to-accommodate claim.

### D. Legitimate Reason for Termination

Finally, defendants argue that no reasonable jury could find Tadder was terminated because of his disability. If an employer fires an employee for any reason other than his disability, such as an inability to do his job, there is no violation of the ADA, even if the inability to do the job is the consequence of the disability. *Garg,* 521 F.3d at 736; *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1196 (7th Cir. 1997) ("The employer who fires a worker because the worker is diabetic violates the Act; but if he fires him because he is unable to do his job, there is no violation, even though the diabetes is the cause of the worker's inability to do his job."). Likewise, the Rehabilitation Act "protects qualified employees from discrimination 'solely by reason of' disability, meaning that if an employer fires an employee for any reason other than that she is disabled – 'even if the reason is the consequence of the disability' – there has been no violation of the Rehabilitation Act." *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013).

Beginning in at least 2006 and extending until his termination in 2008, there is no dispute that Tadder was frequently disciplined for errors and work rule violations. (*See generally* Defs.' Reply PFOF ¶¶ 57-81.) In April 2006, he received a letter of written reprimand for insubordination and negligence in the performance of his assigned duties. On

May 9, 2006, he allowed a nearly-full bottle of cleaning fluid to drain out of the container and into the closet, after which he was again reprimanded for negligence in the performance of his duties. On October 26, 2006, Tadder failed to return to work after taking his scheduled break; he admitted as much on December 4, 2006, and was reprimanded for negligence, as well as "loafing, loitering, sleeping or engaging in unauthorized personal business." After that incident, he served a one-day suspension without pay. Then, in October of 2007, Tadder incorrectly reported his hours; failed to lock doors; and threw away several books from an English professor's office. (*See* Defs.' Reply PFOF ¶ 67.) He was then reprimanded for falsifying records and negligence in the performance of his duties, and served a five-day suspension without pay.

Following these various disciplinary incidents, Tadder failed to report an injury on February 7, 2008. During a later investigation into that incident, Tadder also admitted leaving a maintenance shop door unlocked, storing bags of trash in his closet in violation of written policy (despite having received multiple verbal warnings), and leaving paper towels on the floor, again in violation of policy. After acknowledging these violations at a meeting on April 10, 2008, Tadder was terminated from his employment for failure to comply with health, safety and sanitation requirements and negligence in performance of his assigned duties.

Despite all of these infractions, plaintiff nevertheless argues that a reasonable jury could still conclude that Tadder's disabilities were the "root cause" of his termination. In support, plaintiff points out that Tadder's performance evaluations were "generally" favorable until his various health issues were disclosed in 2004 and Connor took charge. Only then, plaintiff argues, did defendants "step up" disciplinary actions with an eye toward

terminating him. Plaintiff also points to Lund's letter, acknowledging her concern Connor

and she saw progressive discipline as "the means to terminate" Tadder, albeit in the context

of reducing his punishment to encourage better behavior more than three years before

Tadder's termination.

Even drawing all reasonable inferences in Tadder's favor, this evidence is not enough

for a reasonable jury to find that Tadder was terminated because of his disability. *First,*

Tadder's theory about Connor is contradicted by the timing. Connor's employment as

Superintendent of Buildings and Grounds began in July of 1993, and he acted as Tadder's

supervisor since that time. (*See* Connor Aff. (dkt. #29) ¶¶ 2-4.) The parties also agree that

Connor knew about Tadder's diabetes as early as 2002. (*See* Defs.' Reply PFOF ¶ 26.)

Tadder was not terminated until April 2008 -- six years after Connor learned of Tadder's

diabetes and nearly fifteen years after Connor began supervising Tadder.

*Second,* the e-mail from Lund that Tadder holds up as a "smoking gun" of sorts is at

best irrelevant to his case and at worst belies his allegations of discriminatory intent. In

that e-mail, Lund wrote she was *afraid* Connor and she were looking at progressive discipline

as a means to terminate Tadder. Accordingly, she altered her recommendation from a

three-day suspension to a single-day suspension in the hope that the lesser punishment

would be more likely to induce Tadder to improve his performance. (*See* Bach Decl. Ex.

232.) Furthermore, even if the e-mail *were* construed as evidence of defendants' use of

progressive discipline as a means to terminate Tadder, nothing in the e-mail exchange

suggests that their motivation was Tadder's *disability*. Rather, the e-mail exchange discusses

Tadder's repeated failure to complete his assigned work, faults him for lying about it to his

supervisor and discusses an appropriate punishment "to improve behavior." (*Id.*) Though

the e-mail also states that Tadder needs to stay "on top of his diabetes," this comment appears unrelated to Lund's remarks about discipline as "a means to terminate" Tadder and does not support an inference of discriminatory intent.

The record also shows that Tadder received any number of "second chances": he received multiple written reprimands and multiple suspensions of varying lengths for his unsatisfactory work performance over some four years. Yet Tadder continued to violate work rules and repeatedly failed to offer justifications for those violations. Whether, as plaintiff argues, the actual infractions cited as a justification for his termination "were a by-product of his disabilities" ultimately does not matter since Tadder's numerous violations constitute a legitimate, non-discriminatory reason for his termination.

When the evidence demonstrates an employee is incapable of performing a job even with reasonable accommodations, "the employer need not isolate the disability-related causes for an employee's inferior performance from problems that stem from a poor attitude, insubordination, carelessness, or outright disregard for the safety of himself and his co-workers." *Garg*, 521 F.3d at 737 (quoting *Hammel*, 407 F.3d at 865); *see also Waggoner v. Olin Corp.*, 169 F.3d 481, 484-85 (7th Cir. 1999). Accordingly, defendants are entitled to summary judgment.

ORDER

IT IS ORDERED that defendants' motion for summary judgment (dkt. #22) is GRANTED. The clerk of courts is directed to enter judgment and close this case.

Entered this 10th day of April, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge